IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| GRACIE FLOSSIE SPRY, | § | |
| (TDCJ No.490335) | § | |
| VS. | § | CIVIL ACTION NO.4:08-CV-459-Y |
| | § | |
| | § | |
| W. ELAINE CHAPMAN, Warden,[1] | § | |
| FMC--Carswell | § | |

OPINION AND ORDER GRANTING DEFENDANT W. ELAINE CHAPMAN'S
MOTION FOR SUMMARY JUDGMENT

Plaintiff Gracie Flossie Spry ("Spry") has claims remaining against individual defendant W. Elaine Chapman("Chapman").[2] Pending before the Court is defendant Chapman's motion for summary judgment along with a brief in support and an appendix. By the motion for summary judgment, Chapman asserts a qualified-immunity defense to Spry's claim that Chapman was deliberately indifferent to her serious medical needs. Spry filed a response to the motion for summary judgment, with a supporting declaration. Chapman then filed a reply. For the reasons set forth herein, the Court concludes that Chapman's motion for summary judgment must be granted.

---

[1]Chapman, now retired, was the warden at FMC-Carswell from October 2007, until June 2010. See text infra at page 10.

[2]All other claims and defendants have been dismissed under authority of 28 U.S.C. §§ 1915A and 1915(e)(2)(B).

*Summary-Judgment Evidence*

Chapman has filed an appendix in support of her motion for summary judgment which includes: the declaration of Paul Irby, an attorney at FMC--Carswell ("Carswell"), along with 115 pages, as Attachment 1, of attached medical records of the Bureau of Prisons ("BOP") related to Spry (Appendix 1-118). Chapman also included her own declaration dated August 19, 2010 (Appendix 119-123), along with, as Attachments 1 and 2, respectively, copies of a grievance filed by Spry and Chapman's response. Spry filed a response to Chapman's motion for summary judgment accompanied by an appendix containing her declaration, which is dated November 3, 2010.[3]

*Summary-Judgment Standard*

Summary judgment is appropriate when the record establishes "that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law."[4] The party moving for summary judgment has the initial burden of informing the Court of the basis for his motion and producing evidence that tends to show that no genuine dispute as to any material fact exists and that he is entitled to judgment as a

---

[3] Spry's declaration refers to contact with a "Mr. Stone" on May 7, 2007, and a memo signed by defendant Chapman in July 2008. (Spry Declaration ¶¶ 6-7.) In the early stages of this case, Spry provided to the Court a more definite statement with a number of exhibits as attachments. Exhibit 29 to that document is a copy of "Memorandum for Gracie Spry" from Associate Warden John Stone, dated May 7, 2007, and Exhibit 30 is a "Memorandum for Gracie Spry" from Warden Chapman, dated July 2, 2008. Because these documents relate to specific facts in Spry's declaration, the Court will consider these specific exhibits.

[4] FED. R. CIV. P. 56(a).

2

matter of law.[5] Once the moving party has made such a showing, the non-moving party may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing the existence of a genuine dispute for trial.[6] Whether a dispute is "genuine" is a determination of whether it is "real and substantial, as opposed to merely formal, pretended, or a sham."[7] A fact is "material" if its resolution in favor of one party might affect the outcome of the action under governing law.[8] No genuine issue of material fact exists if no rational trier of fact could find for the nonmoving party based on the evidence presented.[9] The Court must consider all evidence in the light most favorable to the nonmoving party.[10]

*Facts*

Plaintiff Spry is a 59-year-old female serving a 240-month sentence of imprisonment. (Amend Compl. (AC) ¶ 5.) Her medical records reveal that when she first arrived at Carswell, in October 2001, she provided a history of childhood polio and severe

---

[5] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986).

[6] *Id.*, at 322-23; *Anderson,* 477 U.S. at 257.

[7] *Bazan ex rel. Bazan v. Hidalgo County,* 246 F.3d 481, 489 (5th Cir. 2001)(noting that only genuine and substantial issues may subject a defendant to the burden of trial in qualified immunity context)(quoting *Wilkinson v. Powell,* 149 F.2d 335, 337 (5th Cir. 1945).

[8] *See Anderson,* 477 U.S. at 248.

[9] *See National Ass'n of Gov't Employees v. City Pub. Serv. Bd.,* 40 F.3d 698, 712-13 (5th Cir. 1994).

[10] *See Id.* at 713.

3

scoliosis, and reported she had undergone surgical placement of Harrington Rods in her spinal column to correct a spinal deformity in 1969. (AC. ¶ 5; Appendix at 3-4.) Spry was diagnosed with pseudotumor cerebri[11] in March 2002, a condition that is indicated by an elevated intracranial pressure, and results in symptoms that may include headaches and vision problems. (AC, ¶ 7.) In 2002, Spry underwent surgical placement of a lumbar-peritoneal shunt, by consultant neurosurgeon, Dr. Joseph Wheeler, to relieve intracranial pressure. (AC, ¶ 6.) Shortly after the surgery, Plaintiff experienced worsening curvature of the spine and distention of her abdomen. (AC, ¶ 7.) After complaints of pain, x-rays performed indicated that Spry had several rib fractures. She was treated for pain, but the cause of the spinal deformation and abdominal distention were medically unexplained.[12]

In October, 2004, Dr. Joseph Wheeler, the neurosurgeon who had performed the shunt surgery, evaluated Spry to determine whether her complaints of abdominal pain and increased abdominal girth were related to the lumbar-peritoneal shunt. He noted that a review of recent MRIs indicated the shunt was in place and functioning correctly and that her back was rotated. He speculated this was the reason for the fractured ribs and he recommended that Spry be

---

[11]See http://www.mayoclinic.com/health/pseudotumor-cerebri/DS00851 ("Pseudotumor ceredri occurs when the pressure inside your skull (intracranial pressure) increases for no obvious reason. Symptoms mimic those of a brain tumor, but no tumor is present.")

[12]As Chapman did not assume any responsibility at FMC-Carswell until October 2007, the records of Spry's ongoing pain management for the period of 2003-2007, were not provided.

4

seen by one of two named scoliosis specialists. (Appendix at 5.) Spry recounts that between this recommendation in October 2004 and continuing through 2007, she was not provided with this recommended consultation. (Spry Declaration, ¶¶ 3-4.) BOP medical records reveal that in March 2005 Spry was taken to a pain-management consultant, Dr. Paul Grant, who recommended and later performed three separate epidural steroid injections in April and May 2005. (Appendix, 6-10.)

In August 2006, orthotist David Hook began fitting Spry with an orthotic back brace to alleviate her pain. The notes of his visits with Spry indicate that he coordinated his treatment with Dr. Wheeler's office to create a brace that would not increase the cerebrospinal pressure from the shunt in her spine. (Appendix 13.) In October 2006, Hook was able to fit a brace that relieved some of Spry's pain, but he noted that the orthosis required modifications to fit Spry's "unique geometry" and to ensure that the brace would not increase pressure in her abdomen. (Appendix 14.) The device was finally fitted for her in October 2007. (Appendix 15-16.)

In January 2007, Spry was seen by a consultant neurosurgeon, who documented that her shunt was in position, and that there was "nothing to add/offer," and that "no neurosurgery follow-up needed." (Appendix 17.) Nevertheless, Spry was evaluated by a consultant neurologist, Dr. Orr, in April 2007. Dr Orr noted that he did not think the shunt was working, and that "this may explain abdominal distension/daily headaches/eye exams." (Appendix 27.)

Dr. Orr recommended that her status be discussed with a neurosurgeon, and that there be a follow up with "neuro." (Appendix 27.)

Spry was informed by an associate warden in May 2007 that her request to see a scoliosis specialist was approved. (Spry Decl. ¶ 3.) Exhibit 29 to Spry's more definite statement is a copy of a Memorandum dated May 7, 2007, signed by associate warden John Stone notifying Spry that her request to find a scoliosis specialist "was approved, and an appointment will be made for this evaluation," but that it could take several weeks. (MDS at Exhibit 29.)

Defendant Chapman became the warden of Carswell in October 2007. (Chapman Decl. ¶ 1.) In that role, Chapman was responsible for the general supervisory management and oversight of Carswell. Chapman was not medically trained, and was not personally involved in making medical decisions with respect to individual inmates, including Spry. (Chapman Decl. ¶6.)

On January 14, 2008, Chapman's office received a "Request for Administrative Remedy" (commonly know as a "BP-9") from Spry in which Spry requested to be examined by a scoliosis specialist. (Chapman Decl ¶ 4; Appendix 124.) In that request, Spry alleged that her condition was life threatening due to the "twisting and shifting of my internal organs," and Spry recounted that she had been given a recommendation for a scoliosis consultation in 2004, but that "to date nothing has been done," and she alleged that she had been "trying to get to Dr. Morgan since 2004 [and that] this is

6

clearly deliberate indifference and willful neglect of my medical condition." (Appendix 124.)

Chapman responded to this request by requiring a response from the appropriate department, in this instance, the Carwsell Health Services Department. (Chapman Decl. ¶ 5.) Although Chapman does not recall this specific grievance, she followed her usual practice of signing a response that had been prepared for her, on February 11, 2008 (Chapman Decl. ¶ 7.) That response informed Spry that she had been approved for a medical evaluation by a consultant scoliosis specialist, but that a repeat MRI of her spine was also needed. (Appendix 125.)

Plaintiff was then evaluated on April 1, 2008, by Dr. Madden with the Neurosurgery Clinic at Parkland Hospital in Dallas, Texas. (Appendix 59-62.) X-ray films taken confirmed severe curvature of the thoracic spine to the right (dextroscoliosis) and mild curvature of the lumbar spine to the left (levoscoliosis). (Appendix 58.) Dr. Madden noted that Spry was a poor risk for surgery given her medical history and indicated that she did not qualify for a full deformity correction procedure. (Appendix 61.) Dr. Madden also noted that her functional ability is "very good," that "she may need to be treated symptomatically" and " she may not be able to get resolution from a surgical procedure." *Id.*

Spry alleges that she personally spoke to Chapman and "begged her to provide my medical care because I was suffering greatly," and contends that Chapman told her 'I'll look into it.'" (Spry ¶

5.) Spry also alleges that she spoke to Chapman in the atrium of the institution about her medical condition and spoke to her in the main line about when an appointment would be made for her to see a specialist, noting that the examination promised by Associate Warden Stone in 2007 still had not occurred a year later in 2008. (Spry Decl. ¶ 7.) Spry's declaration refers to a July 2008 memo and attached as an exhibit to her more definite statement is a July 2, 2008, "Memorandum for Gracie Spry," apparently signed by Chapman, in which reference is made to the April 1, 2008, examination by "consultant scoliosis specialists" at the Neurosurgery Clinic at Parkland Hospital." The memorandum informs her that her case will be discussed at a "Spine Conference (a review board for special cases) to determine whether additional surgery is appropriate for your spinal condition." The document also disclosed that "a follow-up visit with the consultant scoliosis specialist is currently pending." (MDS, Exhibit 30.)

Following Dr. Madden's evaluation at Parkland in April 2008, Carswell medical staff continued to provide medication for Spry's pain management. (Appendix 63-70, 74-91, 93-103, and 107-109.) A consultation record in Spry's medical chart indicates that staff followed up with Dr. Madden on July 15, 2008, to determine if he had reviewed x-rays and whether Spry had been discussed at the spine conference, in order to determine if she was a candidate for surgery. (Appendix 71.)

An MRI was performed of Spry's abdomen on June 1, 2009, and

8

the consultant radiologist who reviewed the MRI, Dr. Mary Caffrey, found that the films revealed no evidence of any acute changes to Spry's conditions. (Appendix 92.)

On November 20, 2009, Bureau of Prisons physician Dr. Resto, noting that Spry had been evaluated in April 2008, and was at "high risk for surgery and possible no benefit from the surgery," again requested an evaluation by spine board to include orthopedic and neurosurgery "for final decision." (Appendix 104.) On February 3, 2010, consulting physicians Ira Claude Denton and Erika Peterson (transcriber), noted that Spry's pain "has been stabilized over the past 2 years," and that "she is functionally at her baseline level at this point." (Appendix 111.) A number of treatment options were discussed, including a further CT scan of her head/sinus and continuation of the medications presently being used and, should her symptoms worsen, pain-relief injections similar to that provided in 2005. *Id.* The report expressly noted that the doctor "would not advocate her undertaking the risks associated with [a] deformity correction operation at this time [but that] should her symptoms progress and she feel pain managed, this may be something that might be entertained in the future." *Id.*

Chapman retired as warden at Carswell in June 2010. (Chapman Decl. ¶ 1.)

*Analysis--Qualified Immunity*

Chapman seeks summary judgment on the basis that she is entitled to qualified immunity from Plaintiff's claim of

9

constitutional violation. Qualified immunity protects government officials performing discretionary functions from personal liability as long as their conduct violates no clearly-established constitutional or federal statutory rights.[13] To overcome such an official's immunity from suit, a plaintiff must allege and, eventually, prove a violation of a right so apparent or so obvious that a reasonable official would understand that what he is doing violates that right.[14] In *Saucier v. Katz*,[15] the Supreme Court mandated a two-step sequence to resolve a qualified-immunity claim: first, a court determines whether the facts alleged or shown state a violation of a constitutional right; second, a court must decide whether the right was clearly established at the time of the defendant's conduct.[16] In *Pearson v. Callahan*,[17] however, the Supreme Court retreated somewhat from this sequential approach:

> while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory. The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.[18]

---

[13]*See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Sorenson v. Ferrie,* 134 F.3d 325, 327 (5th Cir. 1998).

[14]*See Anderson v. Creighton,* 483 U.S. 635, 640 (1987).

[15]533 U.S. 194 (2001).

[16]*Id.* at 201.

[17]555 U.S. 223, 129 S.Ct. 808 (2009).

[18]*Pearson,* 129 S.Ct. at 818.

Although *Pearson* thus authorizes this Court to resolve the qualified-immunity issue through analysis under the second step, the Court concludes that it is appropriate to address and resolve the motion in this instance by beginning with the first step of the qualified-immunity inquiry.[19]

*Violation of a Constitutional Right*

Although Spry refers to 42 U.S.C. § 1983 as authorizing the claims in her amended complaint, because Chapman was a federal employee, the Court has considered the constitutional-violation claim against Chapman as pursued under *Bivens* v. *Six Unknown Named Agents of the Federal Bureau of Narcotics ("Bivens")*.[20] Defendant Chapman first contends that Spry's claim must fail because she failed to sufficiently allege personal involvement of Chapman. In order to state a *Bivens* claim, the claimant must allege personal involvement.[21] Federal officials cannot be held vicariously liable for the acts of subordinates under the doctrine of respondeat

---

[19]*See generally Id.*, at 821("Our decision does not prevent the lower courts from following the *Saucier* procedure; it simply recognizes that those courts should have the discretion to decide whether that procedure is worthwhile in particular cases.")

[20]403 U.S. 388, 297 (1971). *Bivens,* of course, is the counterpart to 42 U.S.C. § 1983, and extends the protections afforded under § 1983 to parties injured by federal actors. *See Evans v. Ball,* 168 F.3d 856, 863 n. 10(5th Cir. 1999) ("A *Bivens* action is analogous to an action under § 1983--the only difference being that § 1983 applies to constitutional violations by state, rather than federal officials"), *overruled on other grounds, Castellano v. Fragozo,* 352 F.3d 939, 948-49 & n. 36 (5th Cir. 2003), *cert den'd,* 543 U.S. (2004).

[21]*Guerrero-Aguiar v. Ruano*, 118 Fed.Appx 832, 833 (5th Cir.2004); *see also Murphy v. Kellar,* 950 F.2d 290, 292 (5th Cir. 1992)(§ 1983 context).

11

superior.²² Without personal involvement or participation in an alleged constitutional violation, the individual should be dismissed as a defendant.²³ Spry does not allege that Chapman was directly involved in the provision of medical care, but she has alleged specific involvement of Chapman in approving her for and then delaying review with a particular medical specialist. Thus, the Court concludes that Spry has alleged sufficiently Chapman's personal involvement with scheduling (or not) Spry to see a particular type of medical provider.²⁴

Spry claims that Chapman was deliberately indifferent to her serious medical needs in violation of the Eighth Amendment. (AC. ¶¶ 20-22; Rule 7 Reply at 2-3.) The government has a constitutional obligation to provide medical care for those it punishes with incarceration. In fact, the Eighth Amendment to the United States Constitution proscribes deliberate indifference to serious medical needs of prisoners, which may involve, among other things, the

---

²²*Cronn v. Buffington*, 150 F.3d 538, 544 (1998)(citing *Abate v. Southern Pac. Transp. Co.,* 993 F.2d 107, 110 (5ᵗʰ Cir. 1993)).

²³*Cronn*, 150 F.3d at 544 (citing *Thompkins v. Belt,* 828 F.2d 298, 304 (5ᵗʰ Cir. 1987)).

²⁴Although Chapman argues against recognition of a violation of Spry's constitutional right to due process of law in the denial of Spry's January 14, 2008, Request for Administrative Remedy, Spry does not assert such a claim in her pleadings. Even if such a claim were alleged, Spry has not stated a violation of due process against Chapman. As the Court of Appeals for the Fifth Circuit found in *Geiger v. Jowers:* "[ An inmate] does not have a federally protected liberty interest in having these grievances resolved to his satisfaction. As he relies on a legally nonexistent interest, any alleged due-process violation arising from the alleged failure to investigate his grievances is indisputably meritless." *Geiger v. Jowers*, 404 F.3d 371, 373-74 (5th Cir.2005); *see also Jenkins v. Henslee*, No. 3-01-CV-1996-R, 2002 WL 432948, at *2 (N.D.Tex. March 15, 2002)(Buchmeyer, J.)("An inmate does not have a constitutional entitlement to a grievance procedure. Hence any alleged violation of the grievance procedure does not amount to a constitutional violation")(citations omitted).

"unnecessary and wanton infliction of pain."[25] In considering the first part of the qualified-immunity analysis, in order to make out a claim of deliberate indifference, a plaintiff must demonstrate that the defendant official has actual subjective knowledge of a substantial risk of serious harm, but responds with deliberate indifference to that risk.[26] Such a finding of deliberate indifference, though, "must rest on facts clearly evincing 'wanton' actions on the parts of the defendants."[27] This subjective deliberate-indifference standard is now equated with the standard for criminal recklessness:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference can be drawn that a substantial risk of serious harm exists, and he must also draw the inference.[28]

Spry's claims against Chapman relate only to the period during which Chapman was warden at Carswell. Plaintiff does not contend and there is no evidence that Chapman was aware of Spry's medical condition and status prior to the time she was involved in responding to the January 14, 2008, administrative remedy request. Thus, it is irrelevant to the remaining claims against Chapman that

---

[25] *See Estelle v. Gamble,* 429 U.S. 97, 103-04 (1976).

[26] *See Hare v. City of Corinth,* 74 F.3d 633, 648 (5th Cir. 1996), *appeal after subsequent remand,* 135 F.3d 320, 327 (5th Cir. 1998).

[27] *Johnson v. Treen,* 759 F.2d 1236, 1238 (5th Cir. 1985); *see also Wilson v. Seiter,* 501 U.S. 294, 297 (1991).

[28] *Farmer v. Brennan,* 511 U.S. 825, 837 (1994); *see also Hare,* 74 F.3d at 648.

an outside consultation with a scoliosis specialist may have been recommended as early as 2004 and that an associate warden informed Spry in 2007 that she was to see a scoliosis specialist within several weeks.

Left at issue, then, is whether the failure to schedule Spry for a consultation with a particular scoliosis specialist, after Chapman informed Spry, on February 11, 2008, that she was eligible for such a consultation, amounts to deliberate indifference to Spry's serious medical needs. As noted, Spry was seen regularly for pain management on the following dates in 2008: February 4, February 7, March 3, April 1, April 28, May 23, June 16, July 7, December 12; and the following dates in 2009: January 5, February 2, February 4, February 27, March 24, April 14, May 8, June 5, July 21, August 18, September 11, October 2, November 2, and November 24. (Appendix 51-56, 63-70, 74-91, 93-103, 107-109. Furthermore, Spry was provided an outside consultation on April 1, 2008, in the Neurosurgery Clinic at Parkland Hospital. (Appendix 57-61.) That reviewing physician did not believe Spry was a candidate for surgery and was not sure if her pain could be relieved, noting "[h]er functional ability is very good and given her complex spine instrumentation and history it appears that she may need to be treated symptomatically and she may not be able to get resolution from a surgical procedure." (Appendix 61.) The consultant noted Spry was still subject to a spine conference, and Chapman so informed her in July 2008. (MDS Exhibit 30.) Subsequent records from July 2008 indicate that Carswell staff asked the Parkland

consultant, Dr. Madden, if he had further reviewed the x-rays and had a spinal conference regarding Spry's candidacy for surgery. (Appendix 71.) Notes from September 2008 indicate additional MRIs were requested. (Appendix 72-73.) Spry was again examined by consulting doctors in the Parkland Hospital neurosurgery clinic after a 2009 request for a final decision of the spinal board. (Appendix 104.) In the resulting February 2010 consultation, as noted above, the physicians explained to Spry that, with regard to her scoliosis, she was not a candidate for surgery. Though her pain had been stabilized she was given a consultation for pain-management injections, if needed. (Appendix 111.)

In *Domino v. Texas Department of Criminal Justice*,[29] the Fifth Circuit discussed the extremely high standard a plaintiff must meet to state a claim for deliberate indifference to serious medical needs:

> It is indisputable that an incorrect diagnosis by medical personnel does not suffice to state a claim for deliberate indifference. *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir.1985). Rather, the plaintiff must show that the officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id.* Furthermore the decision whether to provide additional treatment "is a classic example of a matter for medical judgment." *Estelle*, 429 U.S. at 107. And, the "failure to alleviate a significant risk that [the official] should have perceived, but did not" is insufficient to show deliberate indifference. *Farmer*, 511 U.S. at 838.[30]

Allegations of negligent medical care are not sufficient to

---

[29] 239 F.3d 752 (5th Cir.2001).

[30] *Id.,* at 756.

15

maintain an action for a violation of constitutional rights under the Eighth Amendment regarding medical care.[31] A disagreement of opinion as to the correct medication and/or medical treatment does not constitute an actionable civil-rights claim, but at most, a possible claim of medical malpractice addressed under state law.[32] In this circuit, it is recognized that the failure of a prison doctor to follow the recommendations of another doctor does not amount to deliberate indifference,[33] and the refusal by one doctor to allow an inmate to see an outside specialist does not amount to deliberate indifference.[34] In this regard, the court of appeals explained:

> [Inmate] Alfred next argues that Adams deliberately disregarded the risk to his health by blocking a referral to a specialist even though the prison medical staff was incapable of treating Alfred's injured back. As with his claims against Harbin, Alfred has failed to demonstrate that Adams acted with deliberate indifference. Alfred's medical records reveal that he received extensive treatment for his knee and back injuries. At most, the record reveals that his treatments were unsuccessful, and his allegations of deliberate indifference manifest only a disagreement with the medical treatment he received. A prisoner's disagreement with prison officials regarding medical treatment, however, does not give rise to a claim of deliberate indifference.[35]

---

[31]*See, e.g., Daniels v. Williams,* 474 U.S. 327, 332 (1986) (concluding that the constitution "is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property").

[32]*See Estelle,* 429 U.S. at 107; *Norton v. Dimazana,* 122 F.3d 286, 292 (5th Cir. 1997); *Varnado v. Lynaugh,* 920 F.2d 320, 321 (5th Cir. 1991).

[33]*Stewart v. Murphy,* 174 F.3d 530, 535 (5th Cir. 1998), *cert. den'd, Stewart v. Knutson,* 528 U.S. 906 (1999).

[34]*Alfred v. Texas Dept. Of Criminal Justice,* 80 Fed. Appx. 926, 2003 WL 22682118 at *1 (5th cir. Nov. 13, 2003).

[35]*Alfred,* 2003 WL 22682118, at *1.

Plaintiff's allegations against Chapman fail to meet the deliberate-indifference standard. Even assuming the truth of Spry's allegations that she spoke to Chapman in person about a request for follow-up with an outside-consultant scoliosis specialist, the records provided indicate that Spry was given numerous outside consultations, ongoing medical care, and pain-management care for her chronic pain.

Furthermore, Spry has failed to state any facts or cite any portion of her medical records that would support creating a dispute on whether any alleged delay in referring her for evaluation by a particular scoliosis expert substantially contributed to a more negative outcome or serious condition. There is no indication that Spry's scoliosis symptoms progressed more rapidly or became inoperable during the period in which she alleges there was a delay in treatment. Instead, as claimed in her amended complaint, her spine "rotated" and her abdomen became distended in 2002 and early 2003. (AC.¶ 7.) The cause of the change in Spry's medical condition remains unknown, but a number of consultant experts have determined that her condition is not the result of a malfunctioning shunt, and she is not a good candidate for corrective spinal surgery. (Appendix 5, 59-62, 110-112.)

Plaintiff's amended complaint and her declaration show that she was dissatisfied that her medical condition was not being addressed in a manner she believed appropriate and that she

remained in serious pain. But unsuccessful medical treatment, without more, does not imply that there has been a constitutional violation. The courts of this circuit have repeatedly and consistently rejected claims that prison officials involved in medical-care decisions were deliberately indifferent for failing to prescribe a different course of treatment.[36]

Spry's claims that she should have seen a scoliosis specialist, and the fact that officials indicated that such a consultation would be available, does not mean that the course of treatment by other medical providers and consultants was deliberately indifferent. Spry cannot overcome the fact that she was constantly monitored and treated for her acknowledged pain and was scheduled for and provided outside consultations to determine whether alternative courses of treatment might redress her unique spinal history. Though Spry was told she was a candidate for review by a scoliosis specialist, that she was seen by neurosurgery and orthopedic consultants instead does not establish that Chapman was deliberately indifferent to her serious medical needs.[37]

---

[36]*See e.g., Williams v. Bearry, et al.,* 273 F.3d 1096, 2001 WL 1085197, at *3 (5th Cir. Sep. 7, 2001); *Rudolph v. Brown,* 207 F.3d 657, 2000 WL 122372, at *1 (5th Cir. 2000); *Maldonado v. Keesee, et al.,* 12 F.3d 1098, 1993 WL 543329, at *1 (5th Cir. 1993); *Tassin v. Pacheco,* No. 08-CV-1079, 2009 WL 959985, at *3 (W.D. La. April 8, 2009); *Thomas v. Seago,* No.G-05-0431, 2009 WL 242311, at *8 (S.D. Tex. Jan. 30, 2009).

[37]*See generally Gobert v. Caldwell,* 463 F.3d 339, 351-52 (5th Cir. 2006)(where the Court concluded that the "record of extensive medical treatment spanning the final two and one half months of Gobert's incarceration and the lack of evidence to establish the necessary culpable intent" precluded finding deliberate indifference as a matter of law); *Bejaran v. Cruz,* 79 Fed. Appx. 73, 74 (5th Cir. 2003)(plaintiff's admission that "prison medical staff took x-rays of his back and gave him 'generic,' 'mild medications' to treat his injuries

In order to establish a genuine dispute of material fact, non-moving-party Spry must "'go beyond the pleadings,' and by affidavits or other competent summary judgment evidence cite 'specific facts' that show there is a genuine [dispute] for trial."[38] Spry cannot defeat summary judgment "with conclusory allegations, unsubstantiated assertions or 'only a scintilla of evidence.'"[39] Spry has not met her burden to show that Chapman violated her constitutional right to be free of deliberate indifference to her serious medical needs and that Chapman is not entitled to qualified immunity.[40] Defendant Chapman is therefore entitled to summary judgment based on qualified immunity because plaintiff Spry has not satisfied the first element of the qualified-immunity analysis.[41]

*ORDER*

Therefore, W. Elaine Chapman's September 24, 2010, motion for summary judgment (doc. 43) is GRANTED. Plaintiff shall take nothing on her claims against defendant W. Elaine Chapman, and such claims

---

refute his assertion of deliberate indifference to his medical needs").

[38]*See Bustos v. Martini Club Inc.,* 599 F.3d 458, 468 (5th Cir. 2010)(quoting *Celotex,* 477 U.S. at 324)).

[39]*See Hathaway v. Bazany,* 507 F.3d 312, 319 (5th Cir. 2007)(internal citations omitted).

[40]*See generally Id.,* (noting that once a movant comes forward with the qualified immunity defense, the evidentiary burden is on the non-movant plaintiff to show that defendants are not entitled to qualified immunity.)

[41]Spry included a claim for injunctive relief against Chapman. As noted by Chapman in her brief in support, though injunctive relief would not be available against individual defendant Chapman for a number of reasons, because Chapman is no longer employed at FMC--Carswell, such claim is now moot.

19

are DISMISSED WITH PREJUDICE.

SIGNED May 12, 2011.

_____
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE